All right, our next case this morning is Canyon Fuel Company v. Secretary of Labor, No. 17-9541. Counsel, you may proceed. Thank you, Your Honor. I'm R. Henry Moore. I represent Canyon Fuel. And I will try to reserve a few minutes for rebuttal, but I recognize that's subject to the judge's questioning. This case involves one citation issued to Canyon Fuel at a Sufco mine related to the alternate escapeway that terminates at the 4 East Band Portal. Each working section at Sufco under 75-380, 30 CFR 75-380, is required to have two escapeways. One's an intake escapeway, that is not an issue here, and one's an alternate, which can have intake air or return air. We are going to be talking about the alternate one. The intake primary escapeway is an escapeway that they travel in every day to get to the working sections in the northern part of the mine. And it's drivable, and they ride in vehicles, and if there were an event, they would, in all likelihood, ride out on the vehicles. The 4 East Band Portal is a portal that has existed since the early 1990s and has been used as an escapeway in one form or the other since then. It comes out into a canyon. I know I'm talking to at least two judges who are from Utah, so you know and understand canyons. It comes out into a canyon, into a flat area that's about 50 by 200 feet. There are several buildings out there. There's the fan. There is a generator in case the fan is powered through the mine. If, for some reason, that is cut off, they have a generator out there. There's also a small building for spare parts. Counsel, could I just ask a question? It's prompted in part by the supplemental authority we received in the last couple of days, but I was going to ask this anyway. It has to do with the 24-hour safety regulation and the citation on that. Yes. I need some help in understanding why that citation and that issue is kind of proceeding on a separate track because it seems like the two issues are related. In other words, if you end up being cited and told that the four-east fan portal escapeway won't, it's not up to snuff in terms of the 24-hour ambulance regulation, why wouldn't that have impact on this issue and then really vice versa? It just seems to me that they're related and they're being handled on these separate tracks. Where does that leave us? Can we really proceed that way? They are related in that that's what drove the issuance of the citation on the escapeway. Also, two months after they issued the citation on the escapeway, they issued the citation for the 24-hour emergency transportation. As we see it, while they are related, they are also separate. The escapeway standard has a very specific purpose, get you out of the mine. The 24-hour emergency medical transportation has a different purpose. And what has happened, I think, here is we have lost sight of the fact that the escapeway standard is for getting people out of the mine. Well, let's assume, I know there's a dispute between the parties as to the reach of the regulation. That is, is it limited to getting miners out of the mine and that's the end of it? Or does it also include taking them to some place to get whatever medical attention or other attention they need? Let's assume for the sake of discussion that it's the latter. And if it is, then if the east fan portal ends up being inadequate for that second part under the 24-hour ambulance regulation, then doesn't it render the east, the four east portal inadequate under the escapeway regulation? Well, I don't think it renders it inadequate under the escapeway standard. If Canyon Fuel were not to obtain a petition for modification on the 24-hour emergency transportation, that would probably preclude them from using the four east fan portal as an escapeway. That still leaves the question as, does that standard, does the escapeway standard prohibit use of the four east fan portal? And, you know, I understand that the secretary wants the escapeway standard to do double duty. But we've lost sight of the fact that it's not, that's not the way it's written. That's not the way when they did the standard back in 1996 that they contemplated it. And so we're, we're forgetting that what we want to do is get people out of the mine. And we'll have to deal with, obviously, with the 24-hour emergency medical transportation. We didn't. So is it your position that the secretary's interpretation of the regulation, the language, the nearest mine opening suitable for safe evacuation of miners, is contrary to the language of the statute and therefore unenforced? Language of the standard. The statute doesn't include all of these additional add-on. Well, we have to look at first whether, if it's compatible with the statute, don't we? You have to look at the statute, but the statute is fairly brief in terms of getting people out of the mine. So it's to escape quickly to the surface in the event of an emergency. Yes. Okay. That's what the statute says. So back to my question, we have a regulation that has been interpreted that suitable for safe evacuation of miners means that not just where they pop up out of the ground, but what happens once they pop up. Is it your position? That's the secretary. And so I'm trying to figure out just as much. I mean, shouldn't we defer to the secretary's interpretation of that reg? No. Okay. So why not? I have a list of reasons why not. Okay. First of all, you shouldn't defer if there's been inconsistent interpretation. And on that, are you relying on the fact they haven't been cited? They haven't been cited. But recognize that that's not just, oh, yeah, they were there once or twice. They were there every quarter. But isn't the law pretty clear that the inspector can't bind the secretary? I mean, give me another reason why we shouldn't. I will. But let me finish on that, if I may, Your Honor. Because this isn't just the inspector. This is the district who gets the ventilation map every year and has the escape way marked on it. That's one reason. The second reason is that the standard and the regulatory history of the standard makes clear that what they were talking about is, when they were talking about safe evacuation, was getting out of the mine, not getting off mine property and the like. That is, the secretary's interpretation is inconsistent with that also. It seems like you can take that to an extreme position. What if it were just an opening to the canyon face and a 200-foot fall with a one-foot ledge or no ledge at all? Would you take the same position? No, I wouldn't take the same position. All right. Well, the position I would take is that an operator wouldn't use that as a place to bring people out of the mine. In fact, we have that at this mine. Three east, two east, both come out in much more precipitous canyons, and they've never brought the escape ways out there. Well, as you pointed out, we're interpreting language here, and that's why I'm asking about the limits of your interpretation. Why is the secretary not correct, based on your reading, that you are simply treating as superfluous the word suitable for the safe evacuation of miners? Because if you cross all those out, we're right where you want to be, aren't we? Well, if we crossed them all out, yes, they wouldn't have an argument. Would you have an argument? Well, the argument is that we're bringing people out. You obviously have to have a place outside to assemble. But that doesn't mean that suitable for the safe evacuation means suitable for the safe evacuation off the mine site. So your position is that it's not appropriate for the secretary to consider whether, when they came out, there's no way to get them to a hospital. Let's say you can't fly a helicopter in there. You can't drop a bucket. And so you've got, let's say you have a, the evacuation is due to a cave-in. You've got somebody with a ruptured spleen. It's critical to get them to the hospital. Your position is that it's inappropriate for the secretary to consider what happens once they come up out of the, into the ambient atmosphere. I think under this standard, yes. And you also have to consider, which the secretary apparently didn't consider, in which the two commissioners who voted to reverse said, you've got to balance. You know that this is a shorter way out. It means it's less likely people will be injured. And you've got to balance that against the longer escape way. And there apparently was no balancing within the Department of Labor on those issues. It sounds like you're moving now over into the substantial evidence for the citation. Yes. Is that where you're going? Yes, but it's also a... Well, I need to ask you about that, but go ahead. Okay. Well, it does involve substantial evidence. What it really involves is the secretary didn't do what they should do here, which is balance the two escape ways against each other. From the get-go, the secretary... You mean the ALJ didn't do it? The secretary didn't, and then the ALJ didn't either. They looked at it and they said, no, you can't get them off the area there at all times. And I don't want to get into the petition for modification, but there have been improvements too, or will be. But you've got to... You're balancing two escape ways, one of which is longer and more arduous. And you say, well, if they're out at Four East Portal, they might not be able to get them to the hospital. Well, okay. Let me ask you this, because we're running out of time. Okay. On that score, there was evidence presented, wasn't there, about the relative safety and risks of the two routes. Wasn't it Mr. Yeager who went in and actually traveled the west lease route, and there was evidence that more of that route was drivable? And so there was evidence about the two routes. One's longer, one has more better self-contained, self-rescuer options. All of those things. Wasn't that part of what the ALJ dealt with? I believe that Ms. Yeager went in to simply gather evidence to use at hearing to refute the operator's arguments. I mean, she went in right before the hearing. And so that wasn't. That's more than not going in. She walked both routes, and she timed in. No, she actually didn't walk both routes. She didn't go to Four East Fan Portal. She just went out the alternate, I'm pretty sure. Somebody walked both routes. Because we have times for each number of crossovers compared. That's information the operators applied. And Gary Leeming, the manager of safety, walked the IMSHA's proposed alternative to get an idea how long it would take, walking barefaced without carrying somebody in a stretcher. For me, the question is, in looking at the substantial evidence piece,  or to also consider what happens inside the mine and what happens once you come up out of the ground? I think under this standard, what you consider is whether you can get the people out of the mine to an area that is safe on the surface. And this area where the fan was, was safe. So your position is that an opening that would be unsuitable would be one where people can't safely stand? Well, yes. If, for example, there's Three East. You come out and it's pretty much, while there is a slight level area, you couldn't gather people there. There is, there aren't any facilities there either. There's actually just a... Well, how, let's take Judge McHugh's ruptured spleen example. How is getting them out in that situation, if medical people can't get there, how is that safe? I mean, you're outside the mine opening, but you need immediate attention. How is that safe? Well, it's safe in that you're no longer exposed to whatever hazard it was underground that was causing you to be evacuated. But you're going to die anyway. Well, I wouldn't say that necessarily. If you can't get to a hospital. Well, if you came out, if you came out and you're not going to survive, well, the extra couple hours it takes you to get out on MSHA's route is going to have the same effect. So, let's, you see, that's the problem we have here, is we're trying to take this standard and fit it into a different box. The box is, that MSHA intended was, let's get the people out of the mine. Okay, thank you, Counsel. Thank you. May it please the Court, Emily Toler for the Secretary of Labor. According to Canyon Fuel, MSHA's escapeway standard permits an escapeway to end on a ledge in a canyon wall, forcing miners either to walk five miles on a cattle path through the forest, to scramble thousands of feet up a drainage to the top of the canyon, or to waste an unknown period of time for near-perfect weather to be rescued two at a time by bus or drop of metal. Okay, this is the escape into thin air argument, right? Right. Okay. Where does the regulation itself say anything about what's supposed to happen after the miners have evacuated from the mine? Does it say anywhere in the regulation, on its face? It's the second half of the regulation suitable for the safe evacuation of miners, and specifically, Your Honor, the term safe evacuation. It's the Secretary's interpretation that evacuation doesn't just mean get out of the mine. It means get out of a place of danger. And there are dangers that exist in this instance, and certainly could exist in other instances that are not just inside the mine. But wouldn't 24-hour ambulance service answer that question? I don't think it does. I recognize that there is a significant amount of overlap between the standards, but that standard requires transportation for injured individuals anywhere at the mine, whereas the escape way standard is designed to ensure that all miners, regardless of whether they're injured, are able to get out of danger, not necessarily just be transported to a hospital. Well, you could have medical personnel there, and if they need to be transported to a hospital, then the 24-hour ambulance service addresses that. And so if you read the two regulations together, why isn't the 24-hour ambulance service in a way duplicative of your sort of expanded version of the escape way regulation? I don't think it is duplicative because I think I would say it's more narrow than the interpretation of the escape way regulation, because that takes into account not just whether you can get to a hospital, but whether you can, for example, get away from any flames, smoke, debris, toxic gases, things that might be escaping from the mine after an explosion. And the 24-hour emergency medical transportation standard wouldn't cover those kinds of hazards. I wanted to address then briefly the issue of inconsistent interpretation in this case. It is true that the escape way existed for quite some time without being cited, but as you mentioned, Judge McKee, the case law is pretty clear on this point, that an inspector's not noticing a violation doesn't preclude the secretary from interpreting a standard or certainly from issuing a citation later. And I also want to push back a little bit on the suggestion that because MSHA reviews escape way or ventilation maps, that it necessarily knew exactly what the circumstances were outside for a span portal. MSHA's not a monolith. There's turnover that happens in the district. And I think more importantly, you know, the inspector in this case should be commended, not penalized for having, I apologize, the district manager in this case should be commended rather than penalized for identifying what is a real hazard to miners, which is standing outside for an indeterminate period of time exposed to who knows what weather, suffering from who knows what injuries, waiting to be rescued by a helicopter. Can I ask you again on the secretary's interpretation of the regulation in this instance? Has the secretary interpreted the regulation in this manner any time before this case? I'm not aware that it has happened any time before this case. And we do acknowledge certainly that this is, I hope, unusual and anomalous circumstance where getting to the surface wouldn't necessarily mean that miners are safe. But, you know, as we emphasized in our brief, the fact that it hasn't come up before doesn't mean that MSHA can't issue a citation for it because that's, the agency has to have some leeway to interpret its regulations to encompass situations that it might not necessarily have. Well, my only question, I suppose there's a first time for everything, but is this the first time? As far as I know, yes, it is. Okay. I want to turn then if there are no further questions. Well, let me ask you this. The statute says that escape facilities are to be properly maintained, frequently tested, blah, blah, blah, to allow all persons, including disabled persons, to escape quickly to the surface in the event of an emergency. That sounds pretty much like a focus on fastest way to the surface, doesn't it, in the statute? I think that is a literal reading of the statute. It does say to the surface, but I think that it's pretty clear that MSHA has, under its delegated authority, a little bit of wiggle room around what it means to escape, I think. And the fact that this is the first time that this has come up means that in most mines, for most escape ways, escaping to the surface is what is adequate to protect miners' safety and health. But that is simply not the case at this mine with this escape way. And I don't think that it is consistent with the purpose of the Mine Act, certainly to say that miners can just be left out on a ledge to wait their fate, whatever that might be. I don't think that's consistent with the safety and health-promoting purpose of the statute. And I think that it is certainly within the Secretary's delegated lawmaking authority to interpret a reg to say that certain conditions at the surface also have to be taken into account. And again, the Secretary's not saying that the only thing that matters is what's at the surface. The Secretary certainly recognizes that 380D5, the other subsections of 380, do pertain to what's underground. And certainly those are equally important elements of getting miners to safety. Well, let's turn to that then, which I would call the sufficient evidence piece. The commissioners split in part because at least two of them felt like there wasn't enough attention by the ALJ on the comparison of the routes underground and that there was too much focus, really, on what happens once they reach the surface. Can you speak to that? I can. I have two general points. One is I think that was a misapplication of the substantial evidence standard and instead was sort of a de novo review by the two commissioners of the ALJ's findings. And second, I disagree and I think there was ample evidence that MSHA and the ALJ did consider the advantages and disadvantages of each route and determined taking into account what is the most direct, safe, and practical route and also what route leads to the nearest mine opening suitable for the safe evacuation of miners. Well, it is true that they'd be underground a lot longer with the Secretary's preferred alternate route. The route is longer. It's no longer than the primary escapeway route. And as the district manager testified at the trial, no one from the mine ever explained to him why it was so desperately bad for the alternate escapeway route to be this long when the primary escapeway route was that long. But the comparison isn't to the primary route. It's between the two being considered for the alternate route, correct? That is true, but length is only one of the many considerations that the Secretary... Well, the other considerations also sort of suggest you're going to have a longer time underground because there's a lot more crossovers, right? There are more, yes. So it would be difficult if they're carrying a stretcher to get over those. That's true. I think there was also testimony that it would be difficult carrying a stretcher to escape the ledge and it had never been tried by canyon fuel as well. So I think there are difficulties in both regards there. I also just wanted to emphasize that the overcasts are not impassable. They do have stairs and ramps built into them and they can be crossed. And, again, most, I believe about two-thirds of the proposed escapeway could be driven in vehicles, which I think is an important consideration as well. If they're there, right? If they're there. I do think that it's a pretty cynical take on minors to suggest that they would abandon men and women that they spend half their waking hours with and, you know, run away with the vehicle and even leaving aside that speculation. There was no evidence at trial that that would necessarily happen. Well, Counsel, so I understand that we had some evidence on the matters that you just addressed, but was there any evidence presented that in the event of the types of emergencies that can happen, whether it's gas explosion, cave-ins, whatever it happens to be, that the Four East Fan Portal escapeway would likely result in more deaths and injuries than the West Lease Portal escapeway? I mean, we can talk about driving and this and that and the other, but are we going to lose more people in one than the other? And I didn't see that kind of expert analysis in the record before the ALJ. I suppose I would agree that there was no direct evidence about where more minors are likely to perish, but I think that, you know, on review, the standard is substantial evidence. Simply was there enough evidence for the judge reasonably to have concluded that... Well, isn't that what matters? I mean, isn't that what this is all about is to get as many minors out of there in the event of an emergency as you possibly can. And even if you're balancing it against what might happen after they get out, maybe there's problems there, too, with the Four East Fan Portal. But where is the comparative risk analysis in the record before the ALJ? This was just a matter of saying, well, we've got ones longer than the other, and we can drive this, we can deal with various things, but did anybody come in and sort of map out what might happen under different emergency scenarios? Isn't that why we have the escape ways in the first place? I do agree that that is why escape ways exist, and that the most important thing is certainly getting minors to safety. You're correct, Judge Hafton, that there wasn't numerical statistical evidence about what was more likely to happen in either event. I think there... Don't you think minors would like to know that? And their families? Don't you think the families and minors would like to know that? Perhaps they would if the court believes that that's necessary to resolve the case, and I think the appropriate remedy would be to remand for additional fact-finding on that point. Is that an option for this court, to remand for more fact-finding for the ALJ? I think that would require concluding that there wasn't substantial evidence. No, I understand, but that's sort of like what happened in the 24-hour ambulance case, right? Wasn't that sent back for more fact-finding? Right, and the Assistant Secretary in that case... Is there any way to consolidate all of this? I guess I'm still having a problem with these cases going on separate tracks when we have the overlap of these issues, and it seems like this is being handled in a piecemeal manner. I agree that that's frustrating. I do want to point out, though, that the precise issue before the court today is whether a violation existed in March 2015 when the citation in this case was issued. So to the extent that now there have been developments with the petition for modification, that goes to maybe the adequacy of the abatement or something, but with respect to the specific issue in this case, whether the violation existed at that point, I think there is sufficient evidence to answer that question in the affirmative. And to the extent that that other citation is relevant or is kind of involved, I don't think it's relevant to or at least necessary to decide that issue. I do think, Judge Mastin, there was some testimony about kind of the nature of injuries in a mine disaster and why it matters not just to get out of the mine but also to get treatment, because, you know, injuries occur... There's testimony that injuries occur likely at the moment of the explosion, of the inundation, whatever the mine emergency is, the injury is likely to occur at that point. And, yes, it might take longer to get out of the underground portion of the mine, but we know how long that's going to take. It took Mr. Leeming three hours to do it. It took Ms. Yeager slightly longer, about five minutes. But not in an accident or emergency situation. Right. Has there been any study of that? How long is it going to take not when there's no emergency but when there is an emergency? I think Mr. Leeming... Mr. Leeming's test might have been the best approximation of that. He didn't wear an SDSR but did wear some additional weight. There hasn't been any testing on that point. But at least we know approximately how long it would take. The 4E SAM portal, we have no idea how long it would take because we have no idea what the weather might be like. There's no way to know whether an emergency might occur in the snow or the wind or the rain or at night. Each of those things would preclude the safe evacuation of miners... would preclude getting miners off the shelf and getting the medical treatment. So at least in the case of the West Lees portal, there's some approximation. It's likely to be X number of hours before miners are to safety. And I think that is... that's along with all the other considerations that MSHA took into account, does constitute substantial evidence supporting the judge's finding that the Secretary's proposed route more closely complies with the standard. I also just want to conclude by emphasizing that, you know, miners have such a right to safe and health... healthful workplaces regardless of when or whether MSHA notices a hazard and issues a citation. And I would just urge the court in this case to deny the petition for review, to accept the Secretary's interpretation, and to find that substantial evidence supports the judge's decision. Thank you. Thank you, counsel. Appreciate the arguments of counsel this morning. The case will be submitted. Counsel are excused.